UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
SAMUEL O'BRIEN,

                     Plaintiff,         **MEMORANDUM AND ORDER**
                                           22-CV-3117 (KAM)(LB)

   -against-


CITY OF NEW YORK,
DEPARTMENT OF EDUCATION,

                     Defendant.
---------------------------------------X


**MATSUMOTO, United States District Judge:**

           Plaintiff Samuel O'Brien ("Mr. O'Brien" or "Plaintiff") commenced this action on May 26, 2022, against Defendant City of New York, Department of Education (the "DOE" or "Defendant") and the City of New York alleging discrimination on the basis of race, national origin, sex and religion, and retaliation, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") and Section 296 of the New York State Human Rights Law, N.Y. Exec. Law § 296 ("NYHRL"), as well as intentional infliction of emotional distress ("IIED"). (*See* ECF Nos. 1, Complaint; 20, Amended Complaint ("AC").)  The City of New York was terminated from this action on August 7, 2022, when Plaintiff filed the Amended Complaint.  (AC ¶ 20.)

           Before the Court is Defendant's motion to dismiss the Amended Complaint, pursuant to Federal Rule of Civil Procedure

12(b)(6), which was filed on August 7, 2022 (ECF No. 20, AC), on
the grounds that Plaintiff has failed to state a claim upon
which relief can be granted.  (*See generally* ECF Nos. 37-5,
Motion to Dismiss ("Mot. To Dismiss"); 38, "Reply").  Plaintiff
opposes Defendant's motion to dismiss his claims.  (ECF Nos. 42,
"Opp."; 46, "Sur-Reply".)  For the reasons set forth below,
Defendant's motion to dismiss is **GRANTED** in part and **DENIED** in
part.

**BACKGROUND**

"To survive a motion to dismiss, a complaint must
contain sufficient factual matter, accepted as true, to state a
claim to relief that is plausible on its face." *Ashcroft v.
Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks
omitted).  The Court reviews the operative Amended Complaint,
accepting the factual allegations in the Amended Complaint as
true, for the purposes of the Defendants' 12(b)(6) motion, and
drawing all reasonable inferences in Plaintiff's favor.
*Melendez v. City of New York*, 16 F.4th 992, 1010 (2d Cir. 2021).
To the extent Plaintiff draws "legal conclusion[s] couched as
factual allegation[s]" however, the Court is not bound to accept
such statements as truth.  *Drimal v. Tai*, 786 F.3d 219, 223 (2d
Cir. 2015) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The Court must dismiss Plaintiff's Amended Complaint
if he has failed to plead "enough facts to state a claim to

2

relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Based on the foregoing, this Court accepts as true the following allegations.

## I.   Factual Background

### A. Plaintiff's Hiring at the High School for Youth and Community Development

Mr. O'Brien identifies as a man of "Afro-Indian" descent, originally from "the Caribbean Island of Trinidad." (AC ¶ 2.)  Starting in January 2020, Mr. O'Brien enrolled in a work-study program while pursuing a master's degree in Special Education at Long Island University.  (Opp. at p. 2.)  Through this program, Plaintiff states that he learned from experienced teachers, attended skill-building sessions, underwent a screening and background check, and obtained a Special Education teaching certification.  (*Id.*)  Upon graduating from the program in June 2020, Mr. O'Brien sought employment as a Special Education teacher.  (*Id.*)  Mr. O'Brien received an offer of probationary employment from the High School for Youth and Community Development ("HSYCD") and commenced his role as a

3

Special Education teacher on September 20, 2020, approximately 12 days after the school year began.  (AC ¶ 6.)  During the 2020 – 2021 school year, Plaintiff worked as a teacher for HSYCD on a probationary basis.  (Mot. To Dismiss at p. 5).

### B. Plaintiff's Issues Accessing his Preferred Bathroom

On September 29, 2020, shortly after beginning his tenure as a Special Education teacher at the HSYCD, Mr. O'Brien was given a bathroom key by a custodial worker of Trinidadian descent, referred to as "Mr. G," who advised Mr. O'Brien that the key was for the bathroom on the fifth floor.  (AC ¶ 6.)  On September 30, 2020, Mr. O'Brien went to the fifth-floor bathroom and noticed it was designated by signage as a female bathroom and returned the key provided to him.  (AC ¶ 7.)  It is not alleged whether Mr. O'Brien attempted to use the key to access the fifth-floor restroom or any other restroom in the building, including the several unisex bathrooms in the building or the men's restroom on the fourth floor, all of which HSYCD officials stated Mr. O'Brien had access to.  (AC, Ex. K) ("[T]here are a total of 3 staff restrooms on the floors that are unisex . . . [and a] 4th floor . . . men's only bathroom" that Mr. O'Brien "[has] access to[.]")  When Mr. O'Brien returned the bathroom key to Mr. G and another staff member, Ms. Desdunes, he informed them that he had been given a key to a female restroom and requested a key that would facilitate access to a men's

restroom.  (AC ¶ 7.)  Mr. O'Brien was told by Mr. G. that he
would not be given another key, but that he could access the
unisex restroom on the third floor with the help of Mr. G, who
sat in the third-floor hallway and could use his own key to
facilitate Mr. O'Brien's restroom access, at Mr. O'Brien's
request.  (AC ¶ 8.)  Mr. O'Brien made repeated follow-up
requests to Mr. G. and Mr. Joffe, an Assistant Principal ("AP"),
for a personal key to "either a male or unisex restroom" to
avoid having to ask Mr. G for help accessing the restroom every
time the need arose.  (*Id.*)  Mr. O'Brien's requests were either
rejected or ignored by Mr. G and Mr. Joffe and he did not
receive a key.  (*Id.*)  Instead, Mr. O'Brien was encouraged to
either use a different restroom or to ask Mr. G to open the
third-floor restroom whenever Mr. O'Brien had cause to use the
restroom.  (*Id.*)  No other employees belonging to Mr. O'Brien's
protected classifications were told to request a key from the
custodian in order to use the restroom, which Plaintiff cites as
evidence of discrimination.  (AC ¶ 10.)

    Mr. O'Brien recalls one "particularly humiliating"
experience, which occurred on October 6, 2020, when he had to
interrupt a male Jewish teacher's class to ask to borrow his
bathroom key because Mr. O'Brien was unable to otherwise access
his preferred restroom.  (AC ¶ 11.)  Mr. O'Brien reached out to
another staff member, Ms. Silberstein, to complain that his

repeated requests for a personal key to a unisex or men's restroom were being ignored and that the resulting situation was beginning to impact his professional relationships and performance, as well as his health. (*Id.*) Mr. O'Brien stated that Ms. Silberstein reassured him that she would direct Mr. Joffe to give him a key to the fourth-floor unisex bathroom, which Mr. O'Brien alleges "seemed to have rectified the problem." On October 9, 2020, however, Mr. O'Brien still had to request Mr. G.'s assistance to enter the restroom because "the key [he] was given didn't reflect [his] gender," and he informed Ms. Silberstein of his intention to contact the Department of Education to seek further assistance. (AC, Ex. H.) On October 18, 2020, Mr. O'Brien followed up with Mr. Joffe and Ms. Silberstein via email regarding a key to the fourth-floor restroom, though his email went unanswered by Mr. Joffe. (AC ¶ 12.)

On November 4, 2020, Mr. O'Brien learned that a sign reflecting unisex designation of the fifth-floor restroom was added to the door of the restroom, which previously appeared to be designated for women and for which Mr. O'Brien had originally received and returned a key. (AC ¶ 13; AC, Ex. J.) The older sign appearing to designate the restroom for women was still visible on the door as well. (*Id.*) Mr. O'Brien alleges this sign reflecting unisex designation was added to the fifth-floor

6

restroom in lieu of providing him with a personal key to a unisex or men's restroom.  (AC ¶ 13.)

Ms. Silberstein responded to Mr. O'Brien's email in a November 12, 2020 email, to inform him that she had looked into the bathroom access issue and was assured by Mr. Joffe that Mr. O'Brien had access to both a men's restroom on the fourth floor as well as the multiple unisex bathrooms in the building.  (AC ¶ 14; AC, Ex. K.)  Mr. O'Brien alleges that Ms. Silberstein's impression was false and that he did not have a key to any toilet facility within the building after he returned the initial key.  (*Id.*)  Ms. Silberstein encouraged Mr. O'Brien to reach out to Mr. Cochran, the HSYCD chapter leader of the United Federation of Teachers ("UFT"), with any further questions. (*Id.*)  Following Ms. Silberstein's email, Mr. O'Brien reached out to Mr. Cochran, who advised Mr. O'Brien that prior to his employment at HSYCD, male teachers also used the fifth-floor restroom for which Mr. O'Brien had originally received and returned a personal key.  (AC ¶ 16.)  Mr. O'Brien advised Mr. Cochran that, as a function of his "strong religious beliefs[,]" he did not feel comfortable entering a women's restroom.  (*Id.*) Plaintiff does not allege that he advised Mr. Cochran or anyone else that, after he returned the key he was originally provided, he was being deprived of a personal key to his preferred restroom on the basis of his race, national origin or sex.  Mr.

7

O'Brien stated that he also shared his concerns with another African-American math teacher, Mr. Hamilton, who advised that he "should not[] mess with [Assistant Principal] Joffe."  (AC ¶ 17.)

Mr. O'Brien stated that his difficulty accessing a restroom that matches his gender identity disrupted his acclimation process to HSYCD and diminished his experience as a first-year teacher, including because he was either forced to undertake the embarrassing endeavor of seeking assistance from other teachers and staff members to access a restroom, or had to leave the school grounds entirely to comfortably access a restroom matching his gender identity.  (AC ¶ 18.)  Mr. O'Brien alleges these actions were discriminatory because other teachers belonging to different races and nationalities had personal restroom keys that reflected their gender.  (*Id.*)  Mr. O'Brien cited the constant need to seek assistance from other teachers and staff members, as exemplified by the humiliating experience of interrupting a class session to ask another teacher for a bathroom key, as negatively impacting his professional relationships.  (AC ¶ 11.)  In light of the ongoing COVID-19 pandemic, Mr. O'Brien also noted that the fact that he "went without access to a toilet facility for months," and shared keys with several individuals risked compromising his personal health.  (AC ¶ 15.)

It should be noted that the actual time period during which Mr. O'Brien worked on HSYCD premises without a personal key to his preferred restroom is unclear. The Amended Complaint alleges that he received and returned a key to the unisex restroom on the fifth floor on September 29, 2023, and that from November 19, 2020 to March 22, 2021, the school was closed and all teachers, including Mr. O'Brien, taught remotely. (AC, Ex. L.) However, Mr. O'Brien claims that [he] went without access to a toilet facility for months," while "all other teachers and school staff had their personal key to a bathroom facility that reflected their gender, which they could use at their convenience." (AC ¶ 15.) Mr. O'Brien also adds that "other teachers (all belonging to different races and nationalities other than myself) employed at [HSYCD], not only had personal restroom keys, but ones that also reflected their gender." (AC ¶ 18.) He alleges that no other teacher was of the same "Afro-Indian male Trinidadian" background. (AC ¶ 15.) Mr. O'Brien also alleges that Mr. G, who shares Mr. O'Brien's Trinidadian heritage, mimicked Mr. O'Brien's Trinidadian accent when stating he would "break it down in a language" Mr. O'Brien could understand when denying Mr. O'Brien access to a personal key. (*Id*.) Mr. O'Brien alleges there were no other male teachers required to use "restroom[s] with a female sign affixed to it." (AC ¶ 29.)

9

### C. Plaintiff's Interactions with Co-Teachers at HSYCD

Mr. O'Brien cites two additional interactions with his colleagues that he believes are examples of discriminatory behavior that should have been addressed and rebuked by the HSYCD administration.  (AC ¶¶ 22 – 24.)  In the first instance, Mr. O'Brien recalled that on September 30, 2020, shortly after beginning his probationary position at HSYCD, he received a "condescending email" from a co-teacher whom he had asked for assistance identifying the students with an Individualized Education Program ("IEP") in their shared class.  (AC ¶ 23.) Mr. O'Brien did not yet have access to the system through which he otherwise would have been able to verify the names of students with an IEP.  (*Id*.)  He had mistakenly addressed this teacher as "Mr." and she corrected him, stating that she should have been addressed as "Ms.," that he should know which students had an IEP, that she was not a "hand-holder," and that she did not wish to meet with him after hours to discuss the class they were co-teaching.  (AC, Ex. L.)  Mr. O'Brien relayed the exchange to his supervisors, and the school principal suggested that he focus on his other classes and give this teacher "time." (*Id*; AC ¶ 23.)

Mr. O'Brien also describes another instance of alleged discrimination where a white, Jewish teacher questioned a black student about the student's COVID-19 vaccination status in Mr.

O'Brien's presence.   (AC ¶ 24.)  When the student, who Mr.
O'Brien alleged was uncomfortable with the teacher's
questioning, asked Mr. O'Brien about his own vaccination status,
Mr. O'Brien shared his belief that a person's decisions
regarding vaccinations are "personal" and that maintaining
physical and mental health is "crucial[.]"  (*Id.*)  Mr. O'Brien
recalls that the teacher responded to his statement by saying
"[i]t's people like you who have us in this mess."  (*Id.*)  Mr.
O'Brien alleges that a week later, the principal issued a
memorandum that teachers were strongly encouraged not to ask
students about their vaccination status and that the teacher
involved "was never reprimanded for his insensitive and racist
comment."  (*Id.*)  Mr. O'Brien alleges that Defendant's position
statement in response to his New York State Division of Human
Rights complaint used this incident to show that he was not able
to work with his peers, and that he was falsely accused of
leaving that class early.  (*Id.*)  Mr. O'Brien alleges that in
both interactions, the teachers' remarks were disparaging and
made on the basis of his racial identity and/or were "racist
comment[s]."  (AC ¶¶ 23, 24.)

> **D. Plaintiff's Complaints Regarding His Inability to
> Obtain a Personal Key to his Preferred Restroom**

In addition to making repeated requests directly to
HSYCD officials for a key that would facilitate his access to a

men's or unisex restroom, Mr. O'Brien filed several complaints, including with the UFT representative of the HSYCD, the New York Department of Education's Office of Equal Opportunity & Diversity Management ("OEO"), the New York State Division of Human Rights ("NYDHR"), and the U.S. Equal Employment Opportunity Commission ("EEOC").

The first of Mr. O'Brien's complaints follows a November 12, 2020 letter from Mr. O'Brien's colleague, Ms. Silberstein, encouraging him to reach out to the UFT representative for HSYCD teachers, Mr. Cochran.  (AC ¶ 16.)  Mr. O'Brien complained to Mr. Cochran and also the UFT office later that same day.  (AC, Ex. A.)

The following spring, on April 7, 2021, Plaintiff filed an ethnicity, gender and race complaint with the OEO, listing Mr. Joffe as the perpetrator of the alleged discrimination, and Ms. Silberstein and Ms. Washington as witnesses.  (AC, Ex. B.)  Mr. O'Brien asserted in his OEO complaint that he was given a key to the women's bathroom, but requested a key to a men's or gender-neutral bathroom and was told by a staff member, presumably the custodian, Mr. G., to speak with the Assistant Principal, who told him Mr. Joffe would provide a key to the fourth-floor men's restroom.  (*Id.*)  Mr. O'Brien asserted that instead of providing him with a personal key to his preferred restroom, Mr. Joffe placed a unisex sign on

12

the women's bathroom on the fifth floor and told Mr. O'Brien he could use that restroom.  (*Id.*)  Mr. O'Brien stated that he "would like to be treated fairly and with dignity and respect by the [HSYCD] administration" and alleged that he had been deprived of access to a men's restroom.  (*Id.*)

On July 21, 2021, Mr. O'Brien filed a discrimination complaint with the NYDHR alleging both disparate treatment and retaliation from the HSYCD administration because of his prior complaints, specifically "a complaint via letter to [the] principal [and] UFT."  (AC, Ex. C.)

Finally, Mr. O'Brien exercised the right to request an EEOC review of the December 22, 2021 NYDHR Determination and Order After Investigation of his NYDHR complaint.  (AC, Ex. S.) Following that review, the EEOC delivered a Determination and Notice of Rights to Mr. O'Brien informing him that the EEOC would "not proceed further with its investigation" and advising Mr. O'Brien of his right to bring suit under federal law within 90 days of the March 3, 2022 notice.  (AC, Ex. T.)  Mr. O'Brien filed the instant action within 90 days of that notice.  (ECF No. 1.)

### E. Plaintiff's Retaliation Claims

After receiving a notice, dated August 20, 2021, that his probationary employment would not be continued, Mr. O'Brien was ultimately terminated from his probationary role as an HSYCD

Special Education teacher by the Department of Education on
September 20, 2021, seven (7) days after the start of the new
school year.  (AC ¶¶ 5, 19, 20.)  Mr. O'Brien states that he was
terminated because he made complaints of discrimination on the
basis of his race, national origin, and sex and that his
termination followed conduct and statements from colleagues that
were also retaliatory.  (Sur-Reply at p. 6.)

          Mr. O'Brien cites to "false accusations of lateness"
made against him by HSYCD officials, including a June 22, 2021
"time and attendance letter," (Mot. to Dismiss, Walpole Decl.,
Ex. C.) advising Mr. O'Brien of excessive tardiness on ten days
between April 15 and June 8, 2021 (i.e. arrival at HSYCD
premises after 8:00 am for a total of 128 minutes) and/or
excessive and unauthorized fractional absences (or unsanctioned
early departures) fourteen times for a total of 813 minutes, as
another example of retaliation.  (AC ¶¶ 4, 25; ECF No. 37-4,
Mot. to Dismiss, Walpole Decl., Ex. C.)[1]  Mr. O'Brien claims that
he received a text message from a school official, Ms.
Silberstein, explaining that although the school day normally
began at 8:00 am, online learning had shifted the schedule such
that 8:30 am was an acceptable time for Mr. O'Brien to arrive to
work.  (AC ¶ 25.)  Mr. O'Brien alleges he arrived to work before

---

[1] The Court may consider Exhibit C because Plaintiff's Amended Complaint
refers to this as the "time and attendance letter," which Plaintiff claims
makes false accusations.  (AC ¶¶ 4, 25.)

14

8:30 am, as instructed, and that only after he filed complaints
with the UFT, the OEO, and the NYDHR, did school officials raise
the issue of excessive tardiness and unexcused absences.  (*Id.*)

Mr. O'Brien also refers to Defendant's "biased
performance reviews which contradicted his University (Long
Island University) field officer's review."  (AC ¶ 4.)  Exhibit
L to Plaintiff's Amended Complaint could be liberally construed
to relate to Mr. O'Brien's performance review allegations
because Exhibit L mentions a charge of insubordination.  The May
21, 2021 "charge[] of insubordination[,]" (Sur-Reply at p. 8;
ECF No. 37-1, Mot. to Dismiss, Walpole Decl., Ex. A) references
a March 26, 2021 incident wherein Mr. O'Brien was alleged to
have "engaged in insubordination by finalizing an IEP without
having it reviewed in violation of school protocols and in spite
of repeated instructions not to finalize IEPs until [Assistant
Principal] Washington or Mr. Hingpis, an experienced special
education teacher conducted a final review for quality control
purposes."  (AC, Ex. L.)  The May 21, 2021 letter references an
April 7, 2021 meeting at 11:40 am with the HSYCD UFT
representative, Mr. Cochran, Principal Prendergast, Ms.
Washington, and Mr. O'Brien where Mr. O'Brien was advised that
his finalization of the IEP without final review, in violation
of explicit instruction to obtain a final review, was an act of
insubordination.  (ECF No. 37-2, Mot. to Dismiss, Walpole Decl.,

Ex. A.)  Based on the time stamp of 1:11 pm on Mr. O'Brien's OEO
complaint, it appears that Mr. O'Brien filed a complaint with
the OEO immediately after the April 7, 2021 meeting described in
the May 21, 2021 insubordination letter.  (*Id*; AC, Ex. B.)

## II.  **Legal Standard**

"Title VII makes an employer liable for discriminating
against its employees based on race or [national origin,
religion, or] gender, or for retaliating against an employee for
having challenged such discrimination." *Sanders v. New York
City Human Resources Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)
(internal citations omitted).  Plaintiff claims that he was
discriminated against in violation of both federal and state
law.  Claims under both Title VII and under NYHRL "are generally
treated as analytically identical and addressed together.  Both
are governed by the familiar three-step burden shifting
framework set forth in *McDonnell Douglas Corp. v. Green*, 411
U.S. 792 (1973)." *Farmer v. Shake Shack Enterprises, LC*, 473 F.
Supp. 3d 309, 323 – 24 (S.D.N.Y. 2020) (internal citations
omitted).  At the motion to dismiss stage, the Court "focus[es]
only on whether the allegations in the [Amended Complaint] give
plausible support to the reduced prima facie requirements that
arise under *McDonnell Douglas* in the initial phase of a
litigation." *Littlejohn v. City of New York*, 795 F.3d 297, 312
(2d Cir. 2015).

16

"[F]or a discrimination claim to survive a motion to
dismiss, absent direct evidence of discrimination," an aggrieved
party must show that "[(1)] [he] is a member of a protected
class, [(2)] [he] was qualified, [(3)] [he] suffered an adverse
employment action, and [(4)] [that he] has at least minimal
support for the proposition that the employer was motivated by
discriminatory intent." *Buon v. Spindler*, 65 F.4th 64, 79 (2d
Cir. 2023) (citing *Littlejohn v. City of New York*, 795 F.3d 297,
311 (2d Cir. 2015).  Discrimination is not always carried out so
openly as to enable the aggrieved party to point to direct proof
of the alleged discrimination.  In such cases, the aggrieved
party may allege facts pointing to circumstantial evidence to
assert their case. *Sanders v. New York City Human Resources
Admin.*, 361 F.3d 749, 755 (2d Cir. 2004).

A "plaintiff bears the initial burden of establishing
a prima facie case of discrimination.  If the plaintiff does so,
the burden shifts to the defendant to articulate 'some
legitimate, non-discriminatory reason' for its action." *Holcomb
v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008) (internal
citations omitted).  "Upon such a showing [by the defendant],
the plaintiff must demonstrate that the reasons offered by the
defendant are a mere pretext for discrimination." *Farmer v.
Shake Shack Enterprises, LLC*, 473 F. Supp. 309, 324 (S.D.N.Y.
2020) (citing *Littlejohn v. City of New York*, 795 F.3d 297, 307

– 08 (2d Cir. 2015).  At the motion to dismiss stage however, "[P]laintiff is not required to plead a prima facie case under *McDonnell Douglas* [] as the test was originally formulated[.]" *Buon v. Spinder*, 65 F. 4th 64, 79 (2d Cir. 2023).  Instead, plaintiff's burden of proof to survive a motion to dismiss is "de minimis."  *Farmer v. Shake Shack enterprises, LLC*, 473 F. Supp. 3d 309, 330 (S.D.N.Y. 2020) (internal citations omitted). "[T]he allegations in the complaint need only give plausible support to [a] reduced prima facie burden that arise[s] under *McDonnell Douglas* in the initial phase of Title VII [and NYSHRL] litigation."  *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018).

An adverse employment action is defined as a "materially adverse change in the terms and conditions of employment . . . which is more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (internal citations omitted).  This includes "termination of employment . . . or other indices unique to a particular situation."  *Id.* (citing *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003).  This also includes retaliatory harassment inflicted by co-workers" that an employer "knew about but failed to take action to abate[.]"  *Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426, 446 (2d Cir. 1999).

18

Title VII and NYHRL also prohibit retaliation against an employee alleging discrimination, making it unlawful for any employer to retaliate against an employee because he has "made a charge, testified, assisted, or participated in any manner in any investigation, proceeding or hearing under" 42 U.S.C. § 2000e-3 or because he has "filed a complaint, testified or assisted in any proceeding under" N.Y. Exec. Law § 296(7). "[T]o establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) [he] engaged in protected activity, (2) the defendant was aware of that activity, (3) [he] was subjected to retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there was a causal connection between the protected activity and the materially adverse action or actions." *Carr v. New York City Transit Authority*, 22-CV-792, 2023 WL 5005655, at *5 (2d Cir. Aug. 7, 2023)).

Protected activity is defined broadly to include virtually any instance where "an employee communicates to [his] employer a belief that the employer has engaged in . . . a form of employment discrimination[.]" *Littlejohn v. City of New York*, 795 F.3d 297, 317 (2d Cir. 2015) (citing *Crawford v. Metropolitan Government of Nashville & Davidson County, Tenn.*, 555 U.S. 271, 276 (2009)). This includes "filing of formal charges of discrimination as well as in the making of informal

19

protests of discrimination[.]"  *Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir. 2001).

In the context of a retaliation claim, materially adverse retaliatory action is not limited to a "'materially adverse change in the terms and conditions of employment,' [as in] the substantive discrimination context."  *Carr*, 2023 WL 5005655, at *4 (citing *Burlington Northern & Santa Fe Railway Company v. White*, 548 U.S. 53, 60 (2006)).  Instead, "a 'materially adverse' action is one that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Carr*, 2023 WL 5005655, at *5 (citing *Burlington*, 548 U.S. at 68.)

Plaintiff may demonstrate a causal connection between his engagement in protected activity and materially adverse retaliatory action either "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant" or "indirectly, by showing that the protected activity is followed closely by discriminatory treatment or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct."  *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010).  "Of course, in examining the sufficiency of [Plaintiff's] pleadings of retaliation, we must omit from consideration those episodes . . . that preceded [the] protected activity."  *Gregory v. Daly*, 243

F.3d 687, 701 (2d Cir. 2001).  Title VII and NYHRL are "violated when a retaliatory motive plays a part in [the Defendant's] actions . . . whether or not it was the sole cause . . . even if valid objective reasons for the discharge [also] exist." *Gordon v. New York City Bd. Of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (internal citations omitted).

## III.  Application

This case arises from allegations regarding the repeated efforts of a probationary Special Education teacher working in a new school environment to gain access to a key to a staff restroom that matches his sex.  Plaintiff's core grievance is that he was given a restroom key to a fifth-floor staff restroom that was initially marked as a female restroom, but had been previously used and later marked as a unisex restroom.  (AC ¶ 28, Ex. J.)  After Mr. O'Brien returned the key to this fifth-floor restroom on September 30, 2020, he allegedly was not able to access a unisex or men's staff restroom without having to ask his colleagues, or the custodian, Mr. G., for assistance each time he had to use the bathroom, for two months before the school converted to remote teaching in November 2020, due to the COVID-19 virus.  It is unclear from the Amended Complaint whether the first key Plaintiff was given only opened the door to the fifth-floor restroom, described above and depicted in Exhibit J to the Amended Complaint.  Plaintiff's Amended

21

Complaint includes an email from an HSYCD official advising Mr.
O'Brien that he had access to a men's-only staff restroom on the
fourth-floor and several unisex staff restrooms, (AC, Ex. K),
and also alleges he was advised by the HSYCD UFT representative,
Mr. Cochran, that the fifth-floor restroom he initially received
a key for had been, and was in fact used as a unisex restroom
even before Mr. O'Brien commenced his probationary teaching in
September 2020.  (AC ¶ 16; Opp. at p. 11).  Nor is it clear from
the Amended Complaint how long after Plaintiff returned the
restroom key on September 30, 2020, he went without access to
the personal key he desired while working on HSYCD premises,
particularly given the claim in "Defendant's Position statement
to [the] NY State Division of Human Rights[,]" which Plaintiff
includes in his Amended Complaint, that from November 19, 2020
to March 22, 2021, "all teachers at the school, including
[Plaintiff], taught remotely," due to the COVID-19 pandemic.
(AC, Ex. L.)  That same position statement confirms that on
March 21, 2021, the day HSYCD premises reopened, Plaintiff
received a key to the fourth-floor men's-only restroom and on
March 23, 2021, he confirmed receipt of a key, but Plaintiff
claims he "went without access to a toilet facility for months."
(AC, Ex. L; AC ¶ 15.)  The Amended Complaint and related
exhibits, therefore, include contradictory statements regarding
when Plaintiff eventually obtained a personal key that

corresponded to a restroom matching his sex, and regarding how long Plaintiff actually worked on HSYCD premises without a personal restroom key after he returned the initial key on September 30, 2020.

Nevertheless, for the reasons set forth below, Plaintiff has failed to adequately plead facts other than his own ipse dixit statements, that Defendant's actions, however unreasonable, were motivated by racial, ethnic, sex or religious discriminatory intent under Title VII or NYHRL.  The Court is satisfied, however, that Plaintiff's Amended Complaint provides plausible factual support under "the reduced prima facie requirements" for his claim that Defendant engaged in retaliatory conduct by notifying Plaintiff of his lateness and unauthorized absences, and in ultimately terminating Plaintiff, following Plaintiff's numerous complaints, at least two of which constitute protected activity.  *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018).  By contrast, Plaintiff's allegations regarding retaliation based on harassment from colleagues and regarding biased performance reviews are insufficient to state a claim.

### A. Plaintiff's Title VII Claim of Discrimination on the Basis of His Race, National Origin, Sex and Religion

As an initial matter, Plaintiff states that though he has spiritual and moral values, he does not belong to any

23

particular religious group and fails to identify a specific
religious affiliation or conviction, on the basis of which the
alleged religious discrimination occurred.  (Opp. at p. 4, ¶6)
("Mr. O'Brien does not belong to any organized religion group,
hence is unable to state a religion for [the] record.  Mr.
O'Brien does however hold spiritual and moral values rooted in
stoic philosophy and noted to his UFT representative that it was
against his morals to enter a female bathroom.")  Plaintiff's
claim that he was discriminated against on the basis of his
religion, in violation of Title VII and NYHRL is belied by his
admission that he does not belong to a religious group, practice
a particular religion or hold specific religious (as opposed to
moral) beliefs that relate to the use of his preferred restroom.
Plaintiff does not plead any facts that support his religious
discrimination claim.  Plaintiff, therefore, fails to state a
claim that he was discriminated against on the basis of his
religion.  *See Equal Opportunity Commission v. United Health
Programs of America, Inc.*, 213 F. Supp. 3d 377, 394 – 95
(E.D.N.Y.) (explaining that "[t]o determine whether a given set
of beliefs constitutes a religion for purposes of either the
First Amendment or Title VII, courts frequently evaluate: (1)
whether the beliefs are sincerely held and (2) 'whether they
are, in the believer's own scheme of things, religious' . . . In
analyzing [] whether a set of beliefs are, in the believer's

24

'own scheme of things, religious,' courts look to whether the belief system involves 'ultimate concerns'") (citing *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984)).

Plaintiff's remaining claims of discrimination on the basis of his race (black), national origin (Trinidadian), and sex (male), are presented as interrelated in the Amended Complaint, so the Court will address them together. First, Plaintiff is alleging discrimination based on membership in protected classes. The parties do not dispute that Plaintiff belongs to three protected classes corresponding to race, sex and national origin. Plaintiff alleges that he experienced disparate treatment on the basis of his sex, race, and national origin by not being provided with a personal key to a restroom that was consistent with his sex. (AC ¶ 30.) Yet, Plaintiff alleges that "all other" employees of HSYCD, including men, black employees, and a custodian whose national origin is Trinidadian, like Mr. O'Brien, were given keys to staff restrooms, that were either consistent with their sex, or unisex, or both. (AC ¶ 15.)

Second, Plaintiff was qualified for his probationary position. Plaintiff graduated from Long Island University with a master's degree in Special Education, (Opp. at p. 2) and was ultimately hired as a probationary employee by HSYCD presumably because school officials believed he demonstrated the necessary

25

qualifications.  The Court has considered that the Amended
Complaint attaches as Exhibit S, the NYSDHR decision finding "no
probable cause" to believe that Defendant engaged in
discrimination and retaliation in terminating Mr. O'Brien's
probationary employment for poor performance, rule violations,
and unprofessional conduct during the 2020 – 2021 academic year,
and noting "contemporaneously recorded documentation of Mr.
O'Brien's performance deficiencies."  According to the Amended
Complaint, Exhibit S, "[Plaintiff] received the lowest Measures
of Teacher Practice ('MOTP') score of all teachers at the school
for his pedagogical deficiencies."  Notwithstanding Defendant's
allegations that Mr. O'Brien exhibited poor performance while on
the job, Defendant does not dispute that Plaintiff was qualified
to be hired for his probationary employment as a Special
Education teacher at HSYCD.

Third, Plaintiff alleges what appears to be two
separate claims regarding adverse employment actions.  First,
Plaintiff alleges discriminatory remarks and treatment by his
colleagues, which he claims HSYCD officials were aware of and
failed to redress.  Second, Plaintiff alleges that the repeated
and deliberate withholding of a personal key to his preferred
restroom constitutes disparate, discriminatory treatment, and an
adverse employment action.

        i.      **Plaintiff's Allegations of Discriminatory Treatment by his Colleagues**

        Even construing Plaintiff's allegations regarding the three alleged instances of discriminatory conduct on the part of his co-teachers and colleague in the light most favorable to Plaintiff, the allegations do not give rise to a plausible claim of discrimination.  In the first example wherein Mr. G. allegedly refused to give Mr. O'Brien another restroom key after he returned the first key and in response to his request for a new key, and offers to "'break it down in a language' that [Plaintiff] could understand," Plaintiff alleges that Mr. G.'s statement was "offensive[,]" (AC ¶ 15) and was meant to "mimick[] [Plaintiff's] accent[.]"  (Opp. at p. 4.)  Plaintiff adds that Mr. G. "claimed to be of Trinidadian descent" as well. (AC ¶ 15.)  Here, under the alleged circumstances, "[a] well-recognized inference against discrimination exists where the person who participated in the allegedly adverse action is also a member of the same protected class," here, a black man of Trinidadian national origin.  *Drummond v. IPC Int'l, Inc.*, 400 F. Supp. 2d 521, 532 (E.D.N.Y. 2005).  Although this inference "does not end the inquiry," *Id*, Plaintiff does not meet his burden of alleging that Mr. G.'s conduct and comment were anything more than a discourteous, stray remark that fails to raise an inference of discrimination.  *See Burlington Northern*

*and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("it is important to separate significant from trivial harms [because] Title VII . . . does not set forth a 'general civility code for the American workplace") (citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)).  Moreover, Plaintiff does not allege that Mr. G. ever refused to open a restroom door for Mr. O'Brien when Mr. O'Brien asked.

In the second instance of allegedly discriminatory conduct on the part of his colleagues, Plaintiff attaches as Exhibit Q to his Amended Complaint, an email exchange on September 30, 2020 between himself and his co-teacher, Ms. Shedden, in which she criticized him, apparently because he addressed her as "Mr." rather than "Ms.," asked for the identities of their students with IEPs, and offered to meet between 3:00 pm and 5:00 pm that day.  Ms. Shedden stated that he should know the identities of the students with an IEP and figure out a way to help them, and added that she is "not a hand holder," that she would not meet after hours for his convenience, and referred him to two other teachers to assist him.  (*Id*.)  Mr. O'Brien relayed Ms. Shedden's message to his supervisor and the principal, who advised him to focus on his other classes and give this teacher "time."  (AC ¶ 23.) Plaintiff describes Ms. Shedden's statements as condescending and an "instance of racial discrimination" and alleges that Ms.

28

Shedden "happened to be a white female[.]"  (AC ¶ 23.)
Plaintiff fails to plead facts suggesting that Ms. Shedden's
remarks were motivated by racial, national origin or sex-based
discriminatory intent.  Nor does Mr. O'Brien allege that he
raised any allegation of discrimination when he forwarded Ms.
Shedden's email to his supervisor and the principal.  Mr.
O'Brien sent Ms. Shedden an email apologizing for addressing her
as "Mr." instead of "Ms." and acknowledging that his request for
a list of students with an IEP may have been inappropriate.
(AC, Ex. Q.)  The fact that Ms. Shedden "happened to be a white
female" and Mr. O'Brien is an "Afro-Trinidadian male" does not
in and of itself create an inference that Ms. Shedden's
allegedly "condescending" email response stating her
unwillingness to meet with Mr. O'Brien outside of school hours
or suggesting that Mr. O'Brien should already know "WHO HAS THE
IEP[s]" was motivated by discriminatory animus.  (AC ¶ 23; AC,
Ex. Q.)  "Plaintiff's subjective belief that [he] was
discriminated against does not sustain a discrimination claim .
. . A complaint consisting of nothing more than naked
assertions, and setting forth no facts upon which a court could
find a violation of [Title VII or NYHRL], fails to state a claim
under Rule 12(b)(6)." *Ortiz v. Montefiore Hospital*, 18-CV-4857,
2019 WL 1903366, at *3 (E.D.N.Y. Apr. 29, 2019) (internal
citations omitted).

In the third alleged instance, Plaintiff describes a teacher's comment during an online class on April 8, 2021 that "it's people like you that have us in this mess" following Plaintiff's discussion of his beliefs that people should not rely on the COVID-19 vaccine to protect against contracting the virus.  Plaintiff alleges that Mr. Richter's statement was a "racist comment" and notes that Mr. Richter is a white co-teacher.  (AC ¶ 24.)  Similarly, Plaintiff does not plausibly allege that his co-teacher's comment about "people like you" was made in reference to Plaintiff's race, national origin, or sex, as opposed to Plaintiff's position on COVID-19 precautions.  The Court recognizes that the COVID-19 pandemic, and in particular allegations regarding which racial groups or national origins are to blame for the COVID-19 pandemic, have been weaponized to justify discriminatory conduct and even violence against vulnerable populations.  Plaintiff, however, has alleged no facts from which it can be inferred that that Mr. Richter's comments stem from racial, national origin, or sex-based animus. Plaintiff alleges that a week after this incident, the principal issued a memorandum strongly discouraging teachers from asking students about their vaccine status.  (AC ¶ 24.)  Plaintiff further alleges that he was falsely accused of "storming out [of] the online class early," and that the incident was used to support Defendant's NYDHR position statement that Mr. O'Brien

30

was unable to work with his teaching peers.  (*Id*.)  Defendant offers Mr. Richter's contemporaneous report of the April 8, 2021 incident (which the Amended Complaint describes), in which Mr. Richter states he understood that Mr. O'Brien expressed opposition to COVID-19 precautions such as vaccines and face masks, and that Mr. Richter's comments did not reference Plaintiff's race, but instead responded to Mr. O'Brien's views. The Court need not consider Mr. Richter's contemporaneous report in determining that Plaintiff has not alleged sufficient facts to plausibly establish that Plaintiff's race, color, religion, sex, or national origin was a *motivating factor* in Mr. Richter's statement.  *Vega v. Hemsptead Union Free School Dist.*, 801 F.3d 72, 86 (2d Cir. 2015).

Furthermore, the three instances cited by Plaintiff as allegedly discriminatory conduct are isolated incidents that do not rise to the level of an adverse employment action.  "Title VII does not set forth a general civility code for the American workplace." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010).  This Court finds that Ms. Shedden's email, Mr. Richter's statement and Mr. G.'s mimicking of Mr. O'Brien's accent, even if they understandably "engender[ed] offensive feelings in [Plaintiff,]" did not "sufficiently affect the conditions of [Plaintiff's] employment to implicate Title VII." *Khan v. Abercrombie & Fitch, Inc.*, 35 F. Supp. 2d 272, 276 – 77

(E.D.N.Y. 1999) (quoting *Harris v. Forklift Systems, Inc.*, 510
U.S. 17, 23 (1993)).

> **ii.     Plaintiff's Allegation that his Inability to
> Access his Preferred Restroom Constitutes an
> Adverse Employment Action**

Plaintiff also alleges that after he returned a
restroom key to the unisex bathroom on the fifth floor on
September 30, 2020, the Defendant's failure to provide him with
a personal key to his preferred restroom constituted an adverse
employment action.  Plaintiff claims that his inability to
access a personal key for a restroom matching his sex had
material, negative consequences for his employment, including
the fact that his requests for assistance from colleagues posed
a "serious impediment to [his] health and relationships at
work."  (AC ¶ 11.)  Mr. O'Brien alleges that between September
30, 2020, when he returned the initial bathroom key, and
November 19, 2020, when the school transitioned to online
classes, he did not have a key to a restroom that matched his
sex and that he was provided a key when the school returned to
in-person classes on March 22, 2021.  (AC ¶ 14.)  According to
Exhibit R, which Plaintiff attaches to his Amended Complaint,
Mr. O'Brien was provided a key to the fifth-floor unisex staff
bathroom due to its proximity to his fifth-floor classroom.
This bathroom could be locked from inside to ensure single
occupancy and had served as a unisex bathroom during the 2020 –

2021 school year and in prior years.  AP Joffe had a unisex sign affixed to the fifth-floor unisex staff bathroom to address Plaintiff's concerns.  (AC, Ex. R.)  HSYCD's alleged conduct, "does not constitute an adverse employment action [merely] because the employee sustained some generalized harm," though the Court acknowledges the inconvenience to Mr. O'Brien after he returned the fifth-floor restroom key and had to ask other staff, including Mr. G., to access a restroom.  *Sosa v. New York City Department of Education*, 368 F. Supp. 3d 489, 496 (E.D.N.Y. 2019).  "[T]here must be a link between the discrimination and some tangible job benefits such as compensation, terms, conditions or privileges of employment."  *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal citations omitted). Despite Plaintiff's allegations that Defendant's failure to provide him with a personal key to his preferred restroom had a "significant impact" on his professional relationships and his "physical and mental health," this Court finds that Defendant's actions, as alleged in the Amended Complaint, does not rise to the level of adverse employment action.  *Sosa v. New York City Department of Education*, 368 F. Supp. 3d 489, 496 (E.D.N.Y. 2019).

Even if Plaintiff's inability to regularly access his preferred restroom with a personal key did constitute an adverse

employment action, however, Plaintiff does not plead sufficient
facts to support a reasonable inference that his race, national
origin, or sex were "motivating factor[s]" in the Defendant's
actions.  *See Vega v. Hempstead Union Free School Dist.*, 801
F.3d 72, 85 – 86 (2d Cir. 2015) (at the motion to dismiss stage,
"a plaintiff asserting a discrimination claim . . . [must allege
that] (1) the employer discriminated against him (2) because of
his race, color, religion, sex or national origin . . . . [A]n
action is 'because of' a plaintiffs race, color, religion, sex,
or national origin where it was a 'substantial' or 'motivating'
factor contributing to the employer's decision . . . [although]
a plaintiff in a Title VII case need not allege 'but-for'
causation"); *see also Grant v. New York State Office for People
with Developmental Disabilities*, No. 12-CV-4729, 2013 WL
3973168, at *6 (E.D.N.Y. Jul. 30, 2013) ("[a]ssuming the most
minimal of notice pleading standards, a plaintiff is still
required to give fair notice to the defendants of the factual
bases for his claims . . . [and] allege the essential elements
of an employment discrimination claim – that plaintiff suffered
discrimination on the basis of protected status")(internal
citations omitted).

          Though Plaintiff alleges he was treated disparately,
as compared to other teachers and staff members, he also alleges

that all staff and teachers, some of whom share the same race,
sex and national origin as Plaintiff, "had [a] personal key to a
bathroom facility that reflected their gender, which they could
use at their convenience.")  (AC ¶ 15.)  "A plaintiff relying on
disparate treatment evidence must show [he] was similarly
situated in all material respects to the individuals with whom
[he] seeks to compare [himself]."  *Mandell v. City of Suffolk*,
316 F.3d 368, 379 (2d Cir. 2003) (internal citations omitted).
At the pleading stage, a plaintiff's allegations that he was
treated differently from similarly situated individuals "outside
the protected class will ordinarily suffice for the required
inference of discrimination[.]"  *Littlejohn v. City of New York*,
795 F.3d 297, 313 (2d Cir. 2015).

Plaintiff, however, claims that "*all* other teachers
and school staff," including individuals who share his race, sex
and national origin, had access to a personal bathroom key that
facilitated access to their preferred restroom.  (AC ¶ 15)
(emphasis added).  Plaintiff alleges that "no other employees
belonging to my protected class were asked to request a key from
the custodian when they needed to use the bathroom."  (AC ¶ 10.)
According to Plaintiff, personal keys were provided to teachers
that share Plaintiff's race and sex, and to a staff member who
shares his national origin, (AC ¶¶ 11, 15, 17) which undermines

Plaintiff's claim that his inability to access his preferred
restroom with a personal key was *because of* his race, sex and/or
national origin.

Plaintiff claims he was "the only Afro-Indian male
Trinidadian immigrant teacher on the [HSYCD] teaching staff,"
(AC ¶ 15) an apparent attempt to narrow the group of similarly
situated employees against which Plaintiff's treatment by the
Defendant can be compared.  Nonetheless, Plaintiff still fails
to allege that he is "similarly situated in all material
respects" with all of the other "teachers and school staff" he
distinguishes as having access to personal bathroom keys,
including as it relates to his probationary status, job
description, professional responsibilities, or otherwise.
*Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015)
(finding that "an inference of discrimination can arise from . .
. the more favorable treatment of employees not in the protected
group . . . [but that a plaintiff alleging disparate treatment
must show] []he was similarly situated in all material respects
to the individuals with whom []he seeks to compare [him]self")
(internal citations omitted).  As such, Plaintiff fails to
allege facts supporting an inference that after he returned a
personal key to the unisex fifth-floor bathroom, another
personal key to his preferred bathroom was withheld by HSYCD

36

officials *because of* his race, sex and/or national origin in
violation of Title VII and NYHRL.

### B. Plaintiff's Title VII Claim of Retaliation

Plaintiff refers to four instances of retaliatory
conduct on the part of the Defendant, two of which include
adequate allegations to survive Defendant's motion to dismiss,
as explained in further detail below.  The first is Defendant's
"false accusations of lateness[,]" in the form of a "time and
attendance letter" that was issued on June 22, 2021, after
Defendant learned of Plaintiff's protected activity in filing an
OEO complaint dated April 17, 2021, and which allegedly
"contradicted the text [Plaintiff] received from AP Silberstein
. . . [instructing him] to arrive at work at 8:30 am[.]"  (AC ¶
25.)  For the reasons set forth below, Plaintiff sufficiently
alleges that Defendant's "time and attendance letter"
constitutes an act of retaliation.  (*Id.*)

Second, Plaintiff alleges that Defendant gave him
"biased performance reviews which contradicted [Plaintiff's]
University (Long Island University) field officer's review of
the very same lesson plans and live teaching[.]"  (AC ¶ 4.)
Plaintiff fails to allege facts supporting an inference that
Defendant's performance reviews were motivated by racial,
national origin or sex-based animus, or were causally connected
to Plaintiff's protected complaints.  Consequently, Plaintiff

fails to allege sufficient facts that the performance reviews were retaliatory.

Third, Plaintiff alleges he suffered from "the hostile actions of staff" that constituted retaliation "by school staff after he made complaints" to the UFT in November 2020 and to the OEO on April 7, 2021.  (AC ¶ 3.)  Plaintiff alleges a single incident relating to the online class discussion regarding COVID-19 vaccines on April 8, 2021, that is insufficient to state a retaliation claim.

Finally, Plaintiff alleges that he was terminated from his probationary position shortly after filing his NYDHR complaint, (AC ¶ 5) and that the "eventual loss of his job [was] a result of retaliation."  (Sur-Reply at p. 6.)  Plaintiff's claim that his termination was retaliatory meets the *de minimis* requirements to survive a motion to dismiss.

As an initial matter, Plaintiff's UFT complaints do not constitute protected activities under Title VII and NYHRL. To adequately plead a claim of retaliation at the motion to dismiss stage, Plaintiff must allege that "(1) [he] engaged in protected activity, (2) the defendant was aware of that activity, (3) [he] was subjected to retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there was a causal connection between the protected activity and the materially adverse action or actions." *Carr v. New York*

38

*City Transit Authority*, 22-CV-792, 2023 WL 5005655, at *5 (2d Cir. Aug. 7, 2023)).  Notwithstanding Plaintiff's claim that "[a]ll allegations of misconduct happened only after Mr. O'Brien made a complaint to the UFT office[,]" (Opp. at p. 14) Plaintiff does not adequately plead that his complaint to the UFT office constitutes protected activity within the meaning of Title VII and NYSHRL.

"For purposes of determining whether an activity is protected, [Title VII and NYSHRL] include[] 'both an opposition clause and a participation clause.  The opposition clause makes it unlawful for an employer to retaliate against an individual because [he] 'opposed any practice' made unlawful by Title VII [or by NYSHRL], while the participation clause makes it unlawful to retaliate against an individual because [he] 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under' Title VII [or NYSHRL]."  *Littlejohn*, 795 F.3d at 316 (internal citations omitted).  Plaintiff alleges that he complained about the bathroom key to the UFT representative and UFT main office, and also that he complained informally to several colleagues about his difficulty accessing his preferred restroom with a personal key.  Mr. O'Brien does not allege that the UFT complaints made any reference to his race, national origin, or sex and thus, the UFT complaints do not constitute protected activities under the

39

participation clause of either Title VII or NYHRL.  Neither do these UFT complaints constitute protected activities under the opposition clause because Plaintiff does not allege that he complained of or opposed discriminatory treatment when complaining, either to the UFT representative, Mr. Cochran, or the UFT office on November 12, 2020.  Plaintiff's UFT complaint that Defendant failed to provide Plaintiff with a key to the fourth-floor restroom does not itself constitute a "practice made unlawful by Title VII" or by NYHRL.  *Littlejohn*, 795 F.3d at 316.  Therefore, Plaintiff's UFT complaint does not constitute a protected activity under Title VII or NYSHRL.

It was not until Plaintiff's April 7, 2021 OEO complaint, wherein Plaintiff lists "ethnicity, gender, [and] race" as the basis for allegations of discrimination that Plaintiff engaged in a protected activity under Title VII and NYHRL.

### i.  **Time and Attendance**

Plaintiff's first allegation of retaliatory conduct relates to Defendant's time and attendance warning in a June 15, 2021 meeting with Plaintiff and a June 22, 2021 follow-up letter, that Plaintiff was "late to and/or fractionally absent from work" on approximately twenty-four instances between "April 15, 2021 and June 8, 2021."  (AC ¶ 25; ECF No. 37-4, Mot. to Dismiss, Walpole Decl., Ex. C.)  For purposes of Defendant's

40

12(b)(6) motion, the Court assumes as true Plaintiff's
allegations that he was given instruction from Ms. Silberstein
that the school day generally started at or before 8:30 am, and
that Plaintiff's alleged lateness or early departures were
"never an issue until [he] filed complaints with the . . . OEO
and subsequently, the Human Rights Division."  (AC ¶ 25.)
Plaintiff also alleges that he "was never told by any of [his]
supervisors, the school office staff or AP Jofee that [he] was
arriving late for school."  (*Id.*)

Defendant cites *Chung v. City University of New York*,
605 F. App'x. 20, 24 (2d Cir. 2015) in support of its motion to
dismiss Plaintiff's retaliation claim based on Defendant's
issuance of a time and attendance letter on June 22, 2021.  (ECF
No. 37-4, Mot. to Dismiss, Walpole Decl. Ex. C.)  *Chung* is
distinguishable from the instant action.  In *Chung*, Plaintiff
identified "specific actions [by Defendant] alleged to have
occurred after the filing of his discrimination complaint" which
were "similar to [Defendant's actions] that pre-dated the"
discrimination complaint.  *Chung*, 605 F. App'x. at 24
("Plaintiff expressly characterizes [the later adverse
employment action] as a furtherance of the earlier
discrimination").

In contrast to *Chung*, Plaintiff in the instant action
explicitly alleges that Defendant's June 22, 2021 letter and

41

June 15, 2021 meeting regarding his lateness and unauthorized
absences occurred after Plaintiff filed his OEO complaint on
April 7, 2021, and that Defendant did not take issue with
Plaintiff's alleged lateness or early departures prior to his
filing of the OEO complaint.  (AC ¶ 25.)  Regarding Plaintiff's
retaliation claim relating to Defendant's time and attendance
letter and meeting with Plaintiff, Plaintiff alleges that his
"protected activity was followed closely by discriminatory
treatment" and further "alleges facts that would be sufficient
to establish the other elements of a prima facie case of
retaliation[.]"  (*See* AC ¶ 25) ("I was issued a time and
attendance letter on June 25, 2021 which outlined that I had
been late for the expected work . . . This was never an issue
until I filed complaints with the UFT, OEO, and subsequently,
the Human rights Division. I was never told by any of my
supervisors, the school office staff or AP Jofee that I was
arriving late for school.")  The Court finds that Plaintiff's
allegation that Defendant engaged in retaliatory conduct
following Plaintiff's April 7, 2021 OEO complaint by issuing a
time and attendance letter on June 22, 2021 advising Plaintiff
of excessive lateness and unauthorized absences, allegedly for
the first time, is sufficient to withstand the instant motion to
dismiss the retaliation claim based on time and attendance
warnings.

42

### ii.  **Performance Reviews**

As to Plaintiff's allegation that he received biased performance reviews in retaliation for his complaints, "[a] causal connection in retaliation claims can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment . . . or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015).  Plaintiff's opposition to Defendant's motion to dismiss cites the largely neutral or positive May 2021 review in Plaintiff's Opposition memorandum at Exhibit R, (ECF No. 42-1, Opp., Ex. R.) as a "lesson observation review from [Plaintiff's] field officer" that "contradict[s] the school's lesson analysis[.]"  (Opp. at p. 18 - 19; describing ECF No. 42-1, Opp., Ex. R.)  Plaintiff does not clarify, cite, or explain what biased school reviews by Defendant contradicts his field officer's reviews.  Nor does he state the timing of the allegedly biased school reviews by Defendant that were in relation to Plaintiff's protected activity.

The only reference in Plaintiff's pleadings that could be liberally construed to constitute a negative review of Plaintiff's job performance is found in Exhibit L to Plaintiff's Amended Complaint, in which Defendant stated that Plaintiff engaged in insubordination by failing to obtain the necessary

43

approval from Defendant, contrary to Defendant's repeated
instructions, before finalizing student IEPs on March 26, 2021.
(AC, Ex. L.)  In a May 21, 2021 letter describing the incident,
Plaintiff is alleged to have "finaliz[ed] an IEP without having
it reviewed in violation of school protocols and in spite of
repeated instructions" that a "final review for quality control
purposes" was required.  (AC, Ex. L.)  Defendant's May 21, 2021
letter, describing the March 26, 2021 incident, references an
April 7, 2021 meeting with Plaintiff, the UFT representative,
Mr. Cochran, Ms. Washington, and Principal Prendergast, which
took place at 11:40 am and during which Plaintiff was advised
that "on March 26th, 2021 [he] finalized an IEP in SESIS despite
[] repeated instructions . . . not to[.]"  (ECF No. 37-2, Mot.
to Dismiss, Walpole Decl. Ex. A. [2])  Plaintiff was reminded of
the school's protocols regarding the IEP process and was "urged
[] to follow the guidance and directions" that he was receiving
from his supervisors and colleagues.  (*Id.*)  Plaintiff was also
informed of Ms. Washington's "concern[] that [he] was not

---

[2] Plaintiff attached Exhibit L to the Amended Complaint regarding the finding
of insubordination and referencing the May 21, 2021 letter from Defendant
advising Plaintiff of his insubordination.  The Court thus considers Exhibit
A to the Walpole Declaration in Defendant's Motion to Dismiss, which is the
May 21, 2021 letter to Plaintiff regarding his insubordination charge based
on his failure to obtain necessary approval before finalizing student IEPs.
*See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (finding
that "on a motion to dismiss, a court may consider 'documents attached to the
complaint as an exhibit or incorporated in it by reference . . . [including]
documents either in plaintiffs' possession or on which plaintiffs had
knowledge and relied on in brining suit'") (internal citations omitted).

truthful and forthcoming [] when [] asked [] directly about the progress [Plaintiff] made on this IEP and [his] outreach to Mr. Hingpis." (*Id.*)

To the extent that this allegedly "false charge of insubordination" constitutes a biased performance review that Plaintiff alleges is an act of retaliation, the April 7, 2021, 11:40 am meeting, where Plaintiff was advised of Ms. Washington's claim that he engaged in an act of insubordination, directly preceded Plaintiff's first complaint of discrimination, the OEO complaint filed on April 7, 2021 at 1:11 pm.  (AC, Ex. B.)  Even though the April 7, 2021 charge of insubordination was not described or confirmed in writing until the Defendant's May 21, 2021 letter, Plaintiff was put on notice of the charge of insubordination at the 11:40 am meeting with Defendant on April 7, 2021, before he engaged in protected activity by filing this OEO complaint at 1:11 pm on April 7, 2021.  Thus, Plaintiff's retaliation claim based on the insubordination charge is dismissed.

### iii. **Hostile Actions of Staff**

Plaintiff's third claim of alleged retaliation is also unavailing and is dismissed.  Plaintiff claims he suffered from "the hostile actions of staff" and retaliation "by school staff after he made complaints" to the UFT in November 2020, and to the OEO on April 7, 2021.  (AC ¶ 3.)  The Court has already

45

addressed the UFT complaints that are not protected activity
under Title VII and NYSHRL.  Plaintiff cites "false accusations
by staff on April 21, 2021" as the single retaliatory act by
"school staff" occurring "in close proximity to his complaint."
(Sur-Reply at p. 8.)  Plaintiff describes an allegedly
retaliatory incident on April 21, 2021, in which co-teacher, Mr.
Richter made an allegedly "racist comment" during a class
discussion about COVID-19 vaccines in a virtual classroom
setting, (AC ¶ 24; Opp. at p. 15 - 16) however, the email dated
April 8, 2021 from Mr. Richter describes the same incident as
occurring earlier on the morning of April 8, 2021 – not April
21, 2021.  (ECF No. 37-3, Mot. to Dismiss, Walpole Decl., Ex.
B.)[3]  Although the Second Circuit recognizes "unchecked
retaliatory co-worker harassment, if sufficiently severe" as a
materially adverse action in a *prima facie* retaliation case,
this Court finds that even if Plaintiff had alleged that Mr.
Richter was aware of Plaintiff's April 7, 2021 OEO complaint,
which he did not, Mr. Richter's April 8, 2021 comment does not
rise to the level of "materially adverse" action.  *Richardson v.
New York State Dept. of Correctional Service*, 180 F.3d 426, 446
(2d Cir. 1999); *see also Carr v. New York City Transit
Authority*, 22-CV-792, 2023 WL 5005655, at *5 - 6 (2d Cir. Aug.

---

[3] This Exhibit is properly considered by the Court because Plaintiff has made
allegations about this incident in his Amended Complaint.

46

7, 2023) (finding that in order to "make out a prima facie case"
that Plaintiff was subject to "a retaliatory hostile work
environment[,]" Plaintiff must show "that the allegedly
retaliatory actions, taken either singularly or in the
aggregate, were 'materially adverse'" and "would 'dissuade a
reasonable worker from making or supporting a charge of
discrimination")(internal citations omitted).  Furthermore,
Plaintiff does not allege that Ms. Shedden's September 30, 2020
email regarding students with IEPs and Mr. G.'s comment
allegedly mocking Plaintiff's accent constitute retaliatory
harassment.  Nor could he.  Both incidents predated his
protected complaints.

### iv.  Termination of Plaintiff's Probationary Position

In connection with Mr. O'Brien's claim that he was
terminated by Defendant in retaliation for filing the protected
complaints, Plaintiff has sufficiently "made out a prima facie
case of retaliation under Title VII [and NYHRL] by alleging in
[his Amended Complaint] that [he] complained" to the OEO on
April 7, 2021 (AC, Ex. B), and to the NYDHR on July 21, 2021
(AC, Ex. C), and that he was given notice of Defendant's
discontinuance of his employment on August 20, 2021, (AC, Ex. D)
approximately one week after he received confirmation of receipt
of his NYDHR complaint on August 13, 2021.  *Gorzynski v. JetBlue
Airways Corp.*, 596 F.3d 93, 111 (2d Cir. 2010) (finding that

47

because Plaintiff "lodged her complaint within at most two months of her firing . . . at least for the purposes of making out a prima facie case, she sufficiently alleged a causal connection between her protected complaint . . . and her termination.")  By the time Plaintiff received Defendant's August 20, 2021 notice of discontinuance of his probationary employment, Plaintiff had engaged in multiple instances of protected activity and Defendant does not dispute that HSYCD was aware of Mr. O'Brien's protected complaints.  Job termination is a well-recognized adverse employment action.  *See Farmer v. Shake Shack enterprises, LLC*, 473 F. Supp. 3d 309, 331 (S.D.N.Y. 2020) ("[Plaintiff's] termination [is] undisputedly an adverse employment action").  For the purposes of Defendant's motion to dismiss, Plaintiff "sufficiently alleged a causal connection between [his] protected complaint[s] . . . and [his]f termination."  *Gorzynski*, 596 F.3d at 111.

Plaintiff's claim that he was retaliated against by Defendant when he was terminated from his probationary employment after he engaged in protected filings of discrimination complaints is sufficient to meet the "de minimis" standard at this stage.  *Farmer v. Shake Shack enterprises, LLC*, 473 F. Supp. 3d 309, 330 (S.D.N.Y. 2020) (internal citations omitted).  Accordingly, the Court denies Defendant's motion to

dismiss Plaintiff's claim that he was terminated in retaliation for his protected discrimination complaints.

**IV. Plaintiff's Claim that he was Subject to Hostile Work Environment**

Plaintiff states that his NYDHR and EEOC complaints provide notice of his claim that he was subject to a hostile work environment. (Sur-Reply at p. 7.) Plaintiff asserts this claim for the first time, however, in his opposition to Defendant's motion to dismiss. He did not allege a hostile work environment in his administrative complaint or his Amended Complaint. "A party is not entitled to amend its complaint through statements made in motion papers." *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (declining to consider a claim made by Plaintiff "for the first time in [his] opposition memoranda to the motion to dismiss").

In any case, Plaintiff's allegations, in the Amended Complaint and in subsequent briefing, do not meet the standard for a hostile work environment claim. "To establish a hostile work environment under Title VII [or NYHRL], a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn v. City of New York*, 795 F.3d 297, 320 – 21 (2d Cir. 2015). A hostile

49

work environment claim includes "both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014).

Plaintiff alleges that "the discriminatory actions of [HSYCD,] which include the school's denial of a key to a bathroom, the bias[ed] treatment based on religious belief, race, nationality, and gender . . . [and] his feeling like a second class citizen" all contributed to "the hostile work environment he experienced at the school." (Sur-Reply at p. 7.) Plaintiff also cites the "hostile actions of staff[,]" in reference to the April 21, 2021 incident with Mr. Richter, as a "reflect[ion] [of] the negative and hostile environment [created] by the staff." (Opp. at pp. 16, 18.)

Putting aside the factual contradictions regarding whether, and for how long, Plaintiff was denied possession of a personal key to unisex or men's restrooms, the other alleged instances do not rise to the level of a hostile work environment under Title VII and NYHRL. Mr. Richter's comment and Plaintiff's difficulty accessing his preferred restroom key are not so "severe or pervasive [as to have] alter[ed] the conditions of [his] employment and create[d] an abusive working

environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  As discussed above, the Court finds that the Amended Complaint fails to allege plausible facts that Mr. Richter's comment constitutes a racial epithet in the context of the class discussion, but even if it did, a "mere utterance of an epithet which engenders offensive feelings . . . does not sufficiently affect the conditions of employment to implicate Title VII." *Id*. at 21.  However unfortunate Plaintiff's experience at HSYCD seems to have been, Plaintiff's hostile work environment allegations are well "beyond Title VII's [and NYHRL's] purview." *Id*.

## V.   Plaintiff's Claim of Intentional Infliction of Emotional Distress and his Claim for Punitive Damages

Plaintiff claims Defendant's actions constituted "intentional infliction of emotional distress of having [his] basic human rights violated[,]" (AC ¶ 33) including "an enormous amount of stress" that "caused [him] to worry about his job, his bills and providing for his wife and three children."  (Opp. at p. 18.)  Plaintiff adds that he "not only lost his job but his teaching credentials as well as the ability to complete his Master's degree in Education."  (*Id*.)

Defendant notes, "it is well settled that public policy bars claims sounding in intentional infliction of emotional distress against a governmental agency."  *J.H. v.*

*Bratton*, 248 F. Supp. 3d 401, 416 n. 10 (E.D.N.Y. 2017).

Similarly, "it is well settled that a municipality is immune

from punitive damages." *Piotrowski on behalf of J.P. v. Rocky*

*Point Union Free School District*, 462 F. Supp. 3d 270, 288

(E.D.N.Y. 2020) (citing *City of Newport v. Fact Concerns, Inc.*,

453 U.S. 247, 248 (1981); *Ciraolo v. City of New York*, 216 F.3d

236, 238 (2d Cir. 2000)).  Plaintiff failed to allege plausible

facts to sustain his claim for intentional infliction of

emotional distress or to claim punitive damages against the

Department of Education.  *See J.H. v. Bratton*, 248 F. Supp. 3d

401, 416 n. 10 (E.D.N.Y. 2017) (permitting Plaintiff's "IIED

claim . . . only against the individual [defendants] involved in

the misconduct alleged"); *see also Piotrowski*, 462 F. Supp. 3d

at 288 - 89 ("[p]unitive damages may be awarded against

individual defendants").  Plaintiff's claim that Defendant

intentionally inflicted emotional distress upon him and his

request for punitive damages, therefore, must be dismissed.

## VI.  Conclusion

        For the forgoing reasons, Defendant's motion to

dismiss Plaintiff's claim of retaliation in violation of Title

VII and NYHRL in connection to Defendant's June 22, 2021 time

and attendance letter alleging that Plaintiff was excessively

late and departed early without authorization, as well as

Plaintiff's claim of retaliation relating to Defendant's

discontinuance of Plaintiff's probationary employment is **DENIED.**
Defendant's motion to dismiss all other claims, including
Plaintiff's two remaining retaliation claims; Plaintiff's claims
that he was discriminated against on the basis of his race,
religion, national origin and sex, and that he was subject to a
hostile work environment under Title VII and NYHRL; as well as
Plaintiff's intentional infliction of emotional distress claim,
and claim for punitive damages is **GRANTED** and the claims are
**DISMISSED.**

      Federal Rule of Civil Procedure 15(a) dictates that leave
to amend a complaint shall be freely given "when justice so
requires."  Although the Second Circuit has advised that "the
usual practice upon granting a motion to dismiss [is] to allow
leave to replead," *Cortec Indus., Inc. v. Sum Holding L.P.*, 949
F.2d 42, 48 (2d Cir. 1991) (internal citations omitted), Plaintiff
has already been granted leave to amend his Complaint.  (August
2, 2022 Minute Entry,) *see Ruotolo v. City of New York*, 514 F.3d
184, 191 (2d Cir. 2008) ("leave to amend, though liberally
granted, may properly be denied for . . . failure to cure
deficiencies by amendments previously allowed") (internal
citations omitted).  The Court will nonetheless consider
granting further leave to amend if Plaintiff is able to provide
a proposed Second Amended Complaint that addresses the factual
deficiencies discussed in this Memorandum and Order by September

11, 2023.  Plaintiff's proposed Second Amended Complaint may not replead claims for intentional infliction of emotional distress, seek punitive damages, or bring claims that were not administratively exhausted.

The Defendant is directed to serve Plaintiff with a copy of this Memorandum and Order and note service on the docket by August 15, 2023.  The parties shall meet and confer and jointly advised the Court via ECF, no later than September 11, 2023, how they intend to proceed.  The parties are urged to consider settlement of this action.

**SO ORDERED.**

Dated: August 14, 2023
       Brooklyn, New York

KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York